UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CASSANDRA WILLIAMS, ET AL,

      Plaintiffs,

v.

PORT HURON AREA SCHOOL DISTRICT
BOARD OF EDUCATION, ET AL,

      Defendants.

_____/

Case No. 06-14556

Hon. Victoria A. Roberts

**ORDER**

## I.    INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment
[Dkt. #39]. Plaintiffs filed a Response [Dkt. #49]. For the reasons stated, the Motion is
**GRANTED IN PART** and **DENIED IN PART**.

## II.    BACKGROUND

This civil rights action was filed on behalf of 12 students of Port Huron Northern
High School against Defendants Michael Jones ("Jones"), former Superintendent of the
Port Huron School District; Craig Dahlke ("Dahlke"), Port Huron Northern principal; the
Port Huron Area School District Board of Education ("Board" or "District"); and six board
members, Jeffrey Stout ("Stout"), Thomas Crosby ("Crosby"), Rasha Demashkieh
("Demashkieh"), Geoffrey Hering ("Hering"), Charles Meeker ("Meeker"), and Anna
Kovar ("Kovar").

The lawsuit alleges the students were deprived of an equal educational

1

opportunity as the result of "student on student" racial harassment, in violation of 42 U.S.C. § 1983; Title VI of the Civil Rights Act of 1964 ("Title VI"); the Michigan Elliott Larsen Civil Rights Act ("ELCRA"), MCL 37.2102(a) et seq.; the Michigan Equal Accommodation Act ("MEAA"), MCL 750.146 et seq.; and were subjected to intentional infliction of emotional distress.

Four student Plaintiffs have been dismissed from the action for failing to appear for scheduled depositions. Eight student Plaintiffs remain – Phillip Jones ("Phillip"), Jansyn Southgate Smith ("Jansyn"), Natasha Thames ("Natasha"), Joshua Portis ("Joshua"), Gregory Harrison ("Gregory"), Zenia Hayes ("Zenia"), Kevina Jackson ("Kevina"), and Darcy Hayes ("Darcy").

Plaintiffs' claims center around events which occurred at Port Huron Northern from 2003 through 2006, but they say the history of racial harassment dates back to the 1990's. Plaintiffs allege the persistent racial harassment included graffiti, racial slurs and threats of physical harm. Pursuant to Fed. R. Civ. P. 56, the Court construes the facts in the light most favorable to Plaintiffs.

Port Huron Northern is one of two regular high schools in the Port Huron School District. Port Huron Northern has approximately 1,600 students; only 3% are black. *See Pl. Brief, p. 1.* For the 2003 - 2004 school year, Port Huron Northern received a new black assistant principal ("AP"), Marla Philpot ("Philpot"); she was the only black professional employee at the school. *Id.* Port Huron Northern has three APs with authority to suspend and recommend expulsion for racial harassment. *See Pl. Brief, p. 2.*

One week after Philpot arrived, she found Ku Klux Klan paraphernalia and white

supremacist literature on or under her desk. *See Philpot Dep., p. 28-29.* That school year, both students and parents called Philpot the "n" word, including one parent who came to the school using racial slurs and looking to beat up Philpot after Philpot disciplined her son. *See Philpot Dep., p. 31-32.* All of these incidents were reported to then-principal, Cheryl Wojtas ("Wojtas").

During his first semester in Spring 2003, Darcy heard offensive racial slurs, but did not report them because he was trying to fit in and did not have a rapport with his APs. *See D. Hayes Dep., p. 87.* One incident occurred during his algebra class, when a female student made jokes about him being overweight. After her repeated joking, Darcy told her to "shut the fuck up." The student replied "fuck you, fat nigger." The algebra teacher, Mrs. Schlikert, then walked over and said enough. *See D. Hayes Dep., p. 87-88, 101.*

On another occasion, when Darcy was in the football locker room, a student called the kids from the rival Port Huron High School niggers." That same student, when referring to a Port Huron High running back, said "we hate that fucking nigger, we need to take him out." *See D. Hayes Dep., p. 102.*

In the Fall, 2003, after repeatedly hearing the "n" word, Darcy complained to Wojtas and began giving her the names of students who used racial slurs. Darcy complained to Wojtas on 15 to 20 occasions. *See D. Hayes Dep., p. 77-78, 163-165.* One time was when he heard former Plaintiff, Tiara Long ("Tiara"), addressed by another student as "you nigger." *See D. Hayes Dep., p. 165-166.* Wojtas said she couldn't do anything because she was not there to hear it, and that it was none of Darcy's business. *See D. Hayes Dep., p. 165.* Because Philpot was Darcy's assigned

AP, he complained to her, too. Philpot said school officials could not do anything unless they heard it. *See D. Hayes Dep., p. 82*.

Darcy's mother complained numerous times to Wojtas and Philpot about students using the "n" word frequently. Philpot told her there was not much she could do. *See Rivera Dep., p. 61.* Wojtas said she was unaware of the problem. *See Rivera Dep., p. 44-45.*

During the 2003 - 2004 school year, Tiara found "die nigger" written on her desk. She also found racist writing in a book. Dahlke confirmed that a teacher, Mrs. Jamison, reported these incidents to an AP or the principal. *See Dahlke Dep., p. 234-245, 239-240.*

White students regularly called Josh Chapman ("Josh") a "nigger," threw food at him in the cafeteria, and ripped his shirt. *See P. Chapman Dep., p. 14-16.* On several occasions, Josh fought the students. Josh's mother, Patsy Chapman ("Chapman"), complained to AP Mossett, who said it was difficult to do anything because it was Josh's word against the other student. *See P. Chapman Dep., p. 19.* Chapman was upset that Josh was being disciplined for reacting to racist behavior that the school did not adequately address. *See P. Chapman Dep., p. 15.* The racial taunting continued the following year. Josh was told to ignore it, which he did with limited success. *See P. Chapman Dep., p. 21-22.*

During the 2004 - 2005 school year, Chapman saw two full-sized confederate flags flying on a pick-up truck in the school lot. After the school failed to address it, Chapman complained to AP Mossett. *See P. Chapman Dep., p. 28-29.* Notwithstanding several conversations Chapman had with Mossett about how offensive the confederate

4

flag is to blacks, several days later the truck was still in the lot with the flying flags. *See P. Chapman Dep., p. 32-33.* That same school year, someone painted "nigger" on a rock in front of the school. *See P. Chapman Dep., p. 35.*

Chapman's niece also told Chapman she heard the "n" word at Port Huron Northern. The niece attended Port Huron Northern for one semester, but left because she could not stand the racist comments. *See P. Chapman Dep., p. 38-39.* Chapman's son, James Chapman ("James"), also heard white students using the "n" word in the hallways. Chapman complained to AP Mossett several times, without result. *See P. Chapman Dep., p. 68.*

On June 20, 2005, the Board approved a Student Code Handbook, with a policy prohibiting harassment "perceived as being motivated by" race. *See Def. Motion, Exh. 12.* For a first time violation, the policy required that (1) the student's parents be notified by phone, suspension slip, and/or letter, (2) a conference be held with the involved parties and an administrator or representative, and (3) the student be assigned to detention. At administrative discretion, a first time violation could also result in suspension until parent conferences or contact, and/or up to three school days suspension.

For repeat violations, the harassment policy had two possible consequences. Procedure B required that (1) the student's parents be notified by phone, suspension slip, and/or letter, (2) the matter be referred to the proper police authorities, if appropriate, (3) a conference be held with the involved parties and an administrator, (4) the student be suspended for up to five school days. In repetitive cases or if appropriate, Procedure B allowed a recommendation for expulsion to the Director of

Student Services.

The second alternative, Procedure C, required that (1) written procedural memorandums be followed, if appropriate under the circumstances, (2) the student's parents be notified *immediately* by phone, suspension slip, and/or letter, (3) the matter be referred to the proper police authorities, if appropriate, (3) the student be suspended for ten school days. Procedure C also allowed a recommendation for expulsion to the Director of Student Services, if appropriate.

In September 2005, Chapman told Jones her sons were treated differently based on race. She gave several examples and told him both sons heard the "n" word in school. *See P. Chapman Dep., p. 82-83.* She had one or two face-to-face conversations, and one or two phone conversations with Jones about the racial slurs. *See P. Chapman Dep., p. 85-86.* At some point she could no longer reach Jones, and believed that he either did not get her messages or did not return her phone calls. After she could no longer get through to Jones, she decided to go to the Board. *See P. Chapman Dep., p. 85-88.*

Dahlke was hired as principal of Port Huron Northern after the start of the 2005 - 2006 school year. On October 26, 2005, within days of Dahlke's start date, a racist poster was left on Tiara's locker. The poster included a confederate flag and the words "Rebel - The south will rise - Death to all Niggers," and the words "If this offends you screw off, & get bent!" *See Pl. Brief, Exh. 4.* The next day, she found another racist note inside her locker. The following day or several days later, the word "nigger" was scrawled on Tiara's locker. *See Dahlke Dep., p. 235-237.* Dahlke removed the slur, and in an effort to catch the responsible party, Dahlke secretly placed a hidden camera in a

6

nearby classroom; his efforts were not successful. Dahlke and Tiara's mother contacted police. Dahlke cooperated with the police investigation.

Shortly after the locker incident, a staff member advised Dahlke that several vehicles in the student parking lot had depictions of confederate flags on or inside the vehicles. Dahlke determined the drivers of those vehicles and immediately sent them to their cars to remove or cover the stickers so they were not visible. When Dahlke saw the confederate flag on students' clothing, he directed them to remove the offending item or face disciplinary action. There were several occasions when Dahlke instructed students to remove the confederate flag from their clothing. *See Def. Motion, Exh. 7.*

Also in October 2005, Chapman experienced a racially motivated incident after she left a meeting at Port Huron Northern. Five students were inside a red T-bird, which slowed down directly in front of Chapman's car. The students called Chapman a "nigger," gave her the middle finger, and then, drove off. That same day, when she reported the incident to AP Mossett, he looked up the owner of the car and allegedly told Chapman he didn't believe the incident happened. *See P. Chapman Dep., p. 71.*

During the 2005 - 2006 school year, Natasha was pointed at by white students and called a "nigger." *See Thames Dep., p. 61-62.* Zenia heard white students using the "n" word loudly many times in public with teachers present. Kevina also heard whites saying "nigger" almost every day. *See Jackson Dep., p. 65.* Kevina also found a confederate flag drawn in a classroom textbook. *See Jackson Dep., p. 35.* When Kevina showed it to her teacher, Ms. Kearns, Kearns looked at it and said it wasn't the first time she'd seen something like that. Kevina had to continue using the book. *See Jackson Dep., p. 35.*

Joshua, Tiara, Zenia, and Kevina complained to Philpot that white students were using racial slurs in the halls. *See Portis Dep., p. 41-42.* For example, one student said "I don't like niggers," every time Joshua walked by. *See Portis Dep., p. 37-38.* Joshua also saw racial graffiti in the bathroom near the lunchroom. Philpot said she could not do anything about it. *See Portis Dep., p. 43.*

Around this time, Philpot formed a diversity group of concerned parents and community members to advise Dahlke and brainstorm on ideas to address the racist locker incidents and broader diversity issues at the school. (Defendants say Dahlke formed the group). Along with Philpot and Dahlke, the group included the local NAACP President, a retired black principal, a black staff member, a pastor, and parents of some of the student Plaintiffs.

On November 2, 2005, Philpot emailed Dahlke to complain that several black students expressed a desire to leave Port Huron Northern due to the racially hostile environment. She requested an immediate discussion with the administrative team. *See Def. Motion, Exh. 9.* Philpot heard teachers say they did not think it was a big deal what was going on. *See Philpot Dep., p. 99.*

On November 4, 2005, Dahlke recorded a video and played it over the school's in-house video monitor. He displayed the racist poster and reminded the students the behavior was inappropriate. Dahlke also asked students to come forward if they had information about the person responsible for the drawing. Two students came forward. The drawing apparently had been stolen from the artist and another person placed it in Tiara's locker. *See Def. Motion, Exh. 7.* The artist, who by that time was incarcerated in the juvenile detention facility on unrelated offenses, was expelled. It is unclear if the

person who placed the drawing in the locker was punished.

On November 8, 2005, Dahlke held a meeting for the minority students. All Plaintiffs were present, except Gregory. It was discussed that some of the Plaintiffs used the "n" word and its derivatives at school, and that led white students to also use the word. Dahlke told the minority students not to use the "n" word, and to report its use when they heard it. *See Dahlke Dep., p. 96.* When the white students learned of the meeting, Darcy says they cracked jokes, asking if it was a "nigger meeting" or "only niggers allowed." *See D. Hayes Dep., p. 108.* No similar meeting was held with the white students.

On November 21, 2005 and December 19, 2005, Chapman addressed the Board regarding the persistent racial harassment at Port Huron Northern. Board members Crosby, Demashkieh, Hering, Kovar, Meeker and Stout were present at both meetings. *See. Pl. Brief, Exh. 7.* At the November meeting, Chapman told the Board about (1) seeing and reporting the truck with the confederate flag, (2) the racial slurs, (3) the offensive gestures by the white students in the red T-bird, (4) continued use of the "n" word, and (5) racist graffiti. At the December meeting, Chapman displayed a blow-up picture of the "Death to all Niggers" poster and distributed copies to each board member. There is no evidence the Board directed any response to Chapman's concerns.

The racial incidents continued in early 2006. "Ms. Philpot is a nigger," was scrawled on the wall in the Math wing. *See Philpot Dep., p. 165.* Racist graffiti was found in the bathroom on several occasions. One day, when Darcy was walking the upstairs hallway with his white girlfriend, another student said "you nigger loving bitch,"

in front of Ms. Kearns. When Darcy responded by calling the student a "bitch," he alleges Kearns told him not to say "bitch" out loud, but did not chastise the student who made the slur. *See D. Hayes Dep., p. 83.* According to Darcy, on multiple occasions, students would say "nigger" in front of certain teachers and the teachers ignored the slurs. *See D. Hayes Dep., p. 83.*

In April or May 2006, a text book with racist scrawlings was left inside Philpot's office. Upon closer review, Dahlke discovered a "Hit List" inside the book. The first page of the book had "KKK" and "I will kill all of you" written on it. The following page had a drawing of a noose and the written words "Hit List," along with a list of targeted blacks. Several student Plaintiffs and Philpot appear on the list. The book is filled with slurs and threats such as, "hanging & killing the little niglets," "I beat niggers to death with these" (with an arrow pointing to a photo of an oar), "I want to hang Mrs. Philpot Nigga," and "kill all niggers." The book also has a drawing of a swastika and the word "Nazi." *See Def. Motion, Exh. 20.* The Hit List story was covered by the Detroit television news stations and the Port Huron Times Herald.

A week before the discovery of the hit list, Natasha saw one student show another student a gun in his backpack. This frightened Natasha even more when the hit list came out. Natasha and her mother gave Dahlke the student's name. *See Nurenberg Dep., p. 73.* On May 12, 2006, Dahlke told Jones of a separate threat that someone was going to shoot everyone on the hit list. *See Jones Dep., p. 203-204.* Frightened about their safety, some Plaintiffs stayed home for several days after discovery of the hit list. A week later, an unidentified black student made a written complaint that a student directly behind him screamed "I hate niggers" while walking out

of class.

Port Huron Northern hired three management consultants to conduct a study on the learning environment at Port Huron Northern and to give findings and recommendations. In their report, the consultants determined that the racially charged atmosphere developed at Port Huron Northern over an extended period of time, and was the result of a series of events, rather than a single episode. The consultants opined that policies regarding student conduct, including racial slurs, were not uniformly enforced by Port Huron Northern staff, and the absence of firm, decisive action encouraged continuation of harassment. *See Pl. Brief, Exh 8.*

At the suggestion of the consultant team, Dahlke held three grade-level assemblies at the end of the 2005 - 2006 school year. Dahlke told the students that everyone should be treated with respect and dignity. Dahlke offered anonymity and protection from retaliation for students who reported violators. *See Dahlke Dep., p. 97-100.* Dahlke noticed an increase in reports of violations for 2006 - 2007 school year. *See Dahlke Dep., p. 105-106.* However, the racial slurs and incidents continued that school year. *See Pl. Brief, p. 22-27.*

Plaintiffs say the exodus of black students from Port Huron Northern is the clearest proof that racial harassment interfered with their education. For the 2006 - 2007 school year, approximately 15 black students transferred from Port Huron Northern to Port Huron High. Several others dropped out or left the school district altogether. *See Pl. Brief, p. 21.*

Plaintiffs allege Defendants were "deliberately indifferent" to the harassment, and the racially hostile environment was the result of a lack of minority administrators and

teachers at Port Huron Northern and lax enforcement of school anti-discrimination and harassment rules. Defendants move the Court for summary judgment on all claims.

## III.   STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995). A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties."*Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). Nevertheless, nonmoving party must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

12

## IV.   ANALYSIS

### A.   Violation of Title VI of the Civil Rights Act of 1964 – Hostile Environment

Plaintiffs' Title VI hostile environment claim against the Board centers on events which occurred from September 2003 through September 2006.  Plaintiffs claim that Defendants allowed (1) the use of offensive racial slurs; (2) racial graffiti; (3) threats of physical harm in books, school lockers, desks and other public areas; (4) a picture of the rebel flag, with the words "death to all niggers"; (5) the assault of a black student by a group of white students; and (6) the display of confederate flags on student cars. Additionally, Plaintiffs claim that Defendants were aware of the hostile environment because of complaints made by students and parents, but did little to remedy the situation at the high school.

Title VI protects the right to be free from discrimination under a program that receives federal funding. *42 U.S.C. § 2000d*.  Title VI provides in part that "no person . . . shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Id.*  Section 601 prohibits intentional discrimination based on race, color, or national origin in covered programs and activities. *Alexander v. Sandoval*, 532 U.S. 275, 280-281, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001).

To avoid summary judgment on a claim under § 2000d, a plaintiff must create a genuine issue of material fact that the defendant intended to discriminate on the basis of race. *Buchanan v. City of Bolivar*, 99 F.3d 1352 (1996).  Where the decision makers are

motivated by a factor other than the party's race, there can be no intentional discrimination. *Id.*

Here, Plaintiffs allege that Defendants had notice of and authority to correct "student on student" racial harassment, and failed to do so. They say the "deliberate indifference" constituted intentional discrimination based on race. The question before this Court is whether a school district can be liable under Title VI for deliberate indifference to "student on student" racial harassment.

### 1. Applicable Standard

In *Davis v. Monroe County Board of Ed.*, 526 U.S. 629, 646-47, 119 S. Ct. 1661, L. Ed. 2d 839 (1999), the Supreme Court held that "recipients of federal funding may be liable [under Title IX] for 'subjecting' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student harassment and the harasser is under the school's disciplinary authority."

Neither the United States Supreme Court, nor the Sixth Circuit has applied the *Davis* deliberate indifference standard to a Title VI case. The Supreme Court, however, has repeatedly noted the similarities between the language and application of Title VI and Title IX. See *Fitzgerald v. Barnstable Sch. Comm.*, ___ U.S. ___, 129 S. Ct. 788, 797, 172 L. Ed. 2d 582 (2009) ("Congress modeled Title IX after Title VI of the Civil Rights Act of 1964, and passed Title IX with the explicit understanding that it would be interpreted as Title VI was"); see also *Sandoval*, 532 U.S. at 280 (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 694, 99 S. Ct. 1946, 60 L. Ed. 2d 560 (1979) ("'Title IX . . . was patterned after Title VI of the Civil Rights Act of 1964.'"); see also *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286, 118 S. Ct. 1989, 141 L. Ed.

14

2d 277 (1998) ("[Title VI] is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs. The two statutes operate in the same manner . . . .").

Accordingly, other federal courts hold that a violation of Title VI may be proven by deliberate indifference. See e.g., *Cleveland v. Blount County School Dist. 00050*, 2008 U.S. Dist. LEXIS 6011, 2008 WL 250403 (E.D. Tenn 2008); *Bryant Indep. School Dist. No I-38 of Garvin County*, 334 F.3d 928 (10th Cir. 2003). Those courts reasoned that because Congress based Title IX on Title VI, the analysis of intentional discrimination under Title IX directly informs the analysis of intentional discrimination under Title VI.

This Court is persuaded that a school district can be liable under Title VI for student on student racial harassment, and that the deliberate indifference standard applies.

### 2. Sufficiency of the Evidence

To establish a *prima facie* case of student-on-student racial harassment, Plaintiffs must demonstrate each of the following elements:

(1) the [racial harassment] was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school,

(2) the funding recipient had actual knowledge of the [racial harassment], and

(3) the funding recipient was deliberately indifferent to the harassment.

*Patterson v. Hudson Area Schools*, 551 F.3d 438, 445 (6th Cir. 2009).

Defendants don't contest the first two elements, but say Plaintiffs are unable to establish the third element – deliberate indifference. Defendants also say that review

15

of each individual Plaintiff's claim establishes the case must fail. Defendants cite *Bryant*, *supra*, in support of their argument.

In *Bryant*, the students, and possibly the teachers, acted in a racially discriminatory way towards other students. The principal was aware of racial slurs, graffiti inscribed in school furniture, and notes placed in students' lockers and notebooks. *Id.* at 932. White males were allowed to wear T-shirts adorned with the confederate flag, swastikas, KKK symbols, and hangman nooses on their person and their cars. *Id.* The students and parents complained to the principal about the racist environment, but the principal took no action to remedy the situation. *Id.* at 932-33. The 10th Circuit held the school administrators' lack of response constituted intentional action which could subject them to liability under Title VI.

By contrast, Defendants say that Dahlke, with the advice and counsel of Jones, did everything he could reasonably do to combat racial harassment and enforce the Student Code. As examples of their efforts, Defendants say they (1) disciplined students where they had proof the students committed wrongdoing, (2) increased hallway patrols, (3) set up video surveillance, (4) formed student diversity committees, (5) hired outside consultants and volunteers to provide advice on how to deal with racial issues and create a positive environment, (6) reported incidents to police and sought their assistance, (7) set up student meetings and lunches to help develop rapport with students, (8) conducted class assemblies to inform students about the District's policies against racial harassment, (9) conducted public address system presentations in November 2005 and May 2006 regarding the District's rules against racial writings and statements, (10) conducted Anti-Defamation League training for students, (11)

16

conducted diversity training for staff and teachers, and (12) sought parental involvement. Defendants also say that Jones began developing District-wide standards to address the diversity issue.

Plaintiffs counter that Defendants took no action in response to numerous racial incidents at the school from as early as 1996 through 2005. They say the rampant racial hostility was allowed to fester and build until the 2005 - 2006 school year, when Defendants for the first time addressed it. Thus, they argue that a jury could find that students were being harassed from 2003 through 2005, and Defendants did nothing to stop it. This Court agrees.

The deliberate indifference standard announced by the Supreme Court is a "clearly unreasonable response in light of the known circumstances." *Davis*, 526 U.S. at 648. The Sixth Circuit articulated the level of proof necessary to meet the standard:

> In describing the proof necessary to satisfy the deliberate indifference standard, the Supreme Court stated that a plaintiff may demonstrate defendant's deliberate indifference to discrimination "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 648. The recipient is not required to "remedy" [racial discrimination] nor ensure that students conform their conduct to certain rules, but rather, "the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Id.* at 648-649. The deliberate indifference standard "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Id.* at 648. The standard does not mean that recipients must expel every student accused of misconduct. See *id.* Victims do not have a right to particular remedial demands. See id. Furthermore, courts should not second guess the disciplinary decisions that school administrators make. See *id.*

*Vance v. Spencer County Public School District*, 231 F.3d 253, 260 (6th Cir. 2000).

In *Vance*, the Sixth Circuit Court of Appeals also analyzed several cases in which the courts have permitted cases to go to a jury on the issue of deliberate indifference,

including *Davis*, *supra*, (lack of response could suggest "deliberate indifference on the part of the Board, which made no effort whatsoever either to investigate or to put an end to the harassment."); *Murrell v. School District No. 1, 186 F.3d 1238, 1243* (10th Cir. 1999) (upholding plaintiff's claim of deliberate indifference when school did not inform law enforcement, investigate, nor discipline the offending student); *Wills v. Brown University*, 184 F.3d 20, 25 (1st Cir. 1999) (elaborating on the deliberate indifference standard noting that "if the institution takes timely and reasonable measures to end the harassment, it is not liable under Title IX for prior harassment. Of course, if it learns that its measures have proved inadequate, it may be required to take further steps to avoid new liability."); *Doe v. School Admin. District No. 19*, 66 F. Supp.2d 57, 60-64 (D.Me. 1999) (holding that a jury could find the school district's response was unreasonable in light of known circumstances).

The Sixth Circuit held that where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances. *Id.* at 261.

Applying these standards here, the Court is persuaded that this case should go to a jury on the issue of deliberate indifference. Beginning in the Fall, 2003, and continuing through 2006, students and parents complained to teachers, principals and the Board about student on student conduct, which if true, is fairly characterized as racist, prejudicial, and harassing. Notably, the Board approved a Student Code Handbook in June 2005, which included a policy against racial harassment and threats, but this was nearly two years after Plaintiffs' first complaints. It is unclear whether a

racial harassment policy was in place prior to that time, and if so, whether it was regularly enforced.

Defendants direct the Court to its remedial efforts after Mr. Dahlke's October 2005 hiring as principal, but it does not appear that any such efforts were made in the two years prior to his hiring. And, Defendants present no evidence that the Board intervened to address the racial issue at Port Huron Northern. Hence, while the school officials did not create the hostile environment, it can be argued from the facts in the record that school officials facilitated the harassment, or permitted it to continue with minimal response, at least from Fall 2003 to June 2005.

Moreover, the evidence considered in the light most favorable to Plaintiffs, shows that despite Dahlke's efforts, the racial harassment continued, and arguably escalated to threats of physical harm and assault. A jury, therefore, could find that Defendants were aware their efforts were not working, but continued to use ineffective methods, both from the Fall, 2003, to June 2005, and thereafter. There is a genuine issue of material fact, whether the events and Defendants' responses, constitute deliberate indifference sufficient to support a claim for an intentional violation of Title VI.

Plaintiffs also say that Defendants' efforts to isolate each Plaintiff's claim to minimize the severity of incidents and defeat Plaintiffs' allegations are contrary to *Doe ex rel. Pahssen v. Merrill Community School Dist.*, 2009 WL 817534 (E.D. Mich 2009). The Court declines to individually separate the Plaintiffs' claim, and instead employs the "totality of the circumstances" approach to determine whether Defendants were deliberately indifferent. See *Cleveland*, *supra.*

Because there is a genuine issue of material fact on the issue of deliberate

19

indifference, Defendants' motion for summary judgment on the Title VI claim is **DENIED**.

**B.    Violation of the Elliott Larsen Civil Rights Act -- Hostile Environment**

Plaintiffs' state civil rights claim against the Board, is based on the Michigan Elliott Larsen Civil Rights Act ("ELCRA"), which provides that "[t]he opportunity to obtain employment, housing and other real estate, and the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of religion, race, color, national origin, age, sex, height, weight, familial status, or marital status as prohibited by this act, is recognized and declared to be a civil right." MCL 37.2102(1).

Under the ELCRA, an educational institution may not "[d]iscriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, or sex." MCL 37.2402(a).

Likewise, under the ELCRA, a person may not "[d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status." MCL 37.2302(a).

Plaintiffs say Defendants violated MCL 37.2302 and 37.2402 by allowing Plaintiffs to be harassed due to their race.  Plaintiffs' Complaint alleges that Defendants "denied plaintiffs full utilization and/or benefit of an educational institution because of race by allowing students at [Port Huron Northern] to harass plaintiffs on the basis of race, causing plaintiffs' injuries." Complaint at ¶109.

The Michigan Supreme Court has not addressed whether a civil rights claim is stated under the ELCRA for student on student racial harassment. Plaintiffs rely on *McCarthy v. State Farm Ins. Co.*, 428 N.W.2d 692, 695 (Mich. App. 1988) and *L.W. v. Toms River Regional Sch. Bd. of Educ.*, 189 N.J. 381, 404-46 (N.J. 2007), and say the basis for imposing liability on the School District should be the same as that for employers liable for co-worker harassment – the duty to control the environment, upon notice of harassment. They reject Defendants' contention that this equates to vicarious liability for the actions of students.

Defendants, relying on *Haynie v. State of Michigan,* 468 Mich 302, 208 (2003)*,* say Plaintiffs must still show *respondeat superior* liability, even if proving liability under a theory similar to employee on employee harassment. Defendants say Plaintiffs cannot make that showing, since the students are not employees of the District. Alternatively, Defendants say that to the extent Plaintiffs assert liability based on deliberate indifference, their claim should be dismissed for lack of evidence.

In *McCarthy*, the Michigan Court of Appeals discussed a plaintiff's burden under the doctrine of *respondeat superior* in relation to ELCRA/Title VII sexual harassment claims. The court reiterated that "she must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Id.* at 457. The issue presented was whether the defendant was an employer under the ELCRA, and because there were genuine issues of material fact, the grant of summary judgment for the defendant was reversed. That issue is not present here.

In *L.W.*, the New Jersey Supreme Court recognized a hostile environment claim under the New Jersey Law Against Discrimination ("LAD") for student on student

harassment based on perceived sexual orientation. The *L.W.* court applied a modified standard, adopted from *Lehman v. Toys 'R' Us, Inc.*, 132 N.J. 587, 622 (1993), and held that in the school setting, a school district may be liable under the LAD for student-on-student harassment that creates a hostile educational environment when the school district knew or should have known of the harassment, but failed to take action reasonably calculated to end the harassment. *L.W.* , 189 N.J. 381. The *L.W.* court specifically rejected Title IX's heightened deliberate indifference standard, deciding that it would be unfair to apply a more onerous burden on aggrieved students than on aggrieved employees. *L.W.*, 189 N.J. 381. While *L.W.* is persuasive, the court's analysis was largely based on New Jersey law.

In *Haynie*, the court analyzed an ELCRA claim in the context of a hostile work environment based on co-worker sexual harassment. The plaintiff's estate complained that offensive gender-based comments made by a co-worker created a hostile work environment; the comments were not sexual in nature.

The court held that to establish a *prima facie* case of hostile work environment based on sexual harassment, a plaintiff must show: (1) she belonged to a protected group; (2) she was subjected to communication or conduct on the basis of sex; (3) she was subjected to unwelcome sexual conduct or communication; (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with her employment or created an intimidating, hostile, or offensive work environment; and (5) *respondeat superior*. *Haynie*, 468 Mich at 133.

The *Haynie* court concluded that conduct or communication that was gender-based, but not sexual in nature, did not constitute sexual harassment as defined in the

ELCRA. 468 Mich at 133. Because the court did not reach the issue of *respondeat superior* liability, it is not instructive here.

The Court notes that Michigan courts frequently resolve ELCRA issues by reference to the legal standards applied in Title VII cases. *Sniecinski v. Blue Cross & Blue Shield,* 469 Mich. 124, 666 N.W.2d 186, 193 (Mich. 2003); *Nelson v. Almont Comm. Schools*, 931 F. Supp. 1345, 1357 (E.D. Mich. 1996).

In *Owen v. L'Anse Area Schools*, 2001 U.S. Dist. Lexis 19287 (W.D. Mich 2001), the court considered whether a teacher stated a claim under Title VII and the ELCRA for student on teacher harassment. In *Owen*, the students engaged in a number of abusive acts aimed towards a Jewish teacher, including marking photos of two Presidents with swastikas and derogatory epithets, engaging in harassing behavior, carving a swastika into a podium, and leaving a noose in the teacher's classroom. *Id.* at *8-9. None of these actions resulted in discipline or a serious effort to stop the behavior.

The court noted that even though the students were not agents of the school, the school's intent should be examined by analyzing the actions taken in response to the teacher's reports of harassment. *Id.* at *7-8. The court also noted that it was not dispositive that the teacher did not quit at the height of the harassing activity and said the entire employment environment must be analyzed. *Id.* at *9. The court concluded that a jury could reasonably decide that the defendants' responses were so inadequate that defendants intended that the teacher quit. *Id.* at *8. Or, a reasonable jury could decide that defendants' weak response impliedly encouraged the students to engage in more harassment. *Id.* Since the evidence supported a finding of adverse action, defendants' motion for summary judgment was denied. *Id.* at *10.

23

Similarly, in *Nelson*, the court considered whether a student plaintiff stated a claim for hostile environment sexual harassment under Title IX and the ELCRA. To establish a *prima facie* case, the plaintiff had to prove that: (1) he was a member of a protected class; (2) he was subjected to unwelcome sexual harassment in the form of sexual advances, requests, for sexual favors, or other verbal or physical conduct of a sexual nature; (3) the harassment complained of was based on sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's education and creating an intimidating, hostile, or offensive educational environment that affected seriously the psychological well-being of the plaintiff; and, (5) there was some basis for institutional liability. *Nelson*, 931 F. Supp. at 1356.

With respect to the "institutional liability" element, the plaintiff was required to prove that the school authorities knew of the charged sexual harassment and failed to implement prompt and appropriate corrective action. *Id.* Because sexually hostile environments are characterized by multiple and varied combinations and frequencies of offensive exposures, the court said:

> It is for the trier of fact to judge the totality of circumstances from the perspective of a reasonable person's reaction to a similar environment under essentially like or similar circumstances. This invites consideration of such objective and subjective factors as the nature of the alleged harassment, the background and experience of the plaintiff, co-workers and supervisors, the totality of the physical environment, the lexicon that pervaded the environs before plaintiff entered into it, coupled with the reasonable expectation of the plaintiff upon voluntarily entering it. *Id.* at 1357.

Applying that standard, the court concluded that summary judgment was improper because the plaintiff stated several issues of material fact regarding the principal's knowledge and the reasonableness of his actions.

This Court is not convinced that the Michigan Legislature intended to grant students less protection for racial harassment than sexual harassment. Likewise, the Court is not convinced that teachers have greater protections under the ELCRA than students. Because the ELCRA expressly prohibits discrimination based on race, this Court concludes that Michigan courts would recognize a hostile environment claim based on racial harassment and apply the same standards outlined above.

Applying those standards to the facts of this case, summary judgment on Plaintiffs' ELCRA claim would be improper in light of the issues of material fact stated In Section A. Defendants' motion for summary judgment on Plaintiffs' ELCRA claim is **DENIED**.

### C. Violation of the Equal Accommodation Act

This claim is based on violation of the Equal Accommodation Act ("MEAA"), MCL 750.146 *et seq.* Michigan protects the public's right to equal access to public accommodations through the ELCRA, and provisions in the penal code, the MEAA, that criminalize violations of public accommodation law and impose civil liability.

Section 146 provides:

All persons within the jurisdiction of this state shall be entitled to full and equal accommodations, advantages, facilities and privileges of inns, hotels, motels, government housing, restaurants, eating houses, barber shops, billiard parlors, stores, public conveyances on land and water, theaters, motion picture houses, public educational institutions, in elevators, on escalators, in all methods of air transportation and all other places of public accommodation, amusement, and recreation, subject only to the conditions and limitations established by law and applicable alike to all citizens and to all citizens alike, with uniform prices. Rooming facilities at educational, religious, charitable or nonprofit institutions or organizations, and restrooms and locker room facilities in places of public accommodation may be separated according to sex. MCL 750.146.

Section 147 further provides:

25

Any person being an owner, lessee, proprietor, manager, superintendent, agent or employee of any such place who shall directly or indirectly refuse, withhold from or deny to any person any of the accommodations, advantages, facilities and privileges thereof or directly or indirectly publish, circulate, issue, display, post or mail any written or printed communications, notice or advertisement to the effect that any of the accommodations, advantages, facilities and privileges of any such places shall be refused, withheld from or denied to any person on account of race, color, religion, national origin, sex or blindness or that any particular race, color, religion, national origin, sex or blindness is not welcome, objectionable or not acceptable, not desired or solicited, shall for every such offense be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not less than $100.00 or imprisoned for not less than 15 days or both such fine and imprisonment in the discretion of the court; and every person being an owner, lessee, proprietor, manager, superintendent, agent or employee of any such place, and who violates any of the provisions of this section, shall be liable to the injured party, in treble damages sustained, to be recovered in a civil action: Provided, however, That any right of action under this section shall be unassignable. In the event that any person violating this section is operating by virtue of a license issued by the state, or any municipal authority, the court, in addition to the penalty prescribed above, may suspend or revoke such license. MCL 750.147.

These laws (1) guarantee and protect the right to full and equal enjoyment of educational institutions and places of public accommodation and (2) prohibit the publication of a communique that asserts that an educational institution or place of public accommodation is not open because of an individual's [race]. *Scalise v. Boy Scouts of Am.*, 265 Mich. App. 1 (2005).  A plaintiff must allege withholding, refusal, or denial of public accommodations, or illegal advertising, in order to maintain a civil action for damages grounded on violation of the MEAA. *Magid v. Oak Park Racquet Club Associates*, Ltd. 84 Mich App 522, 269 NW2d 661 (1978).

Plaintiffs' Complaint alleges that the District "denied plaintiffs the full and equal accommodations, advantages, facilities and privileges of a place of public accommodation, namely a public education, because of race . . ."  Plaintiffs say liability is premised on the District's duty to ensure that black students had the same

opportunities as their white counterparts, including the opportunity to be free of peer harassment. The District counters that since the offending students were not agents of the District, and the District specifically forbade racial harassment and attempted to address it in good faith, it did not violate the MEAA.

Although there is no case directly on point, the clear, unequivocal language of the Michigan Legislature in the MEAA is that one may not deny equal accommodations, advantages, facilities and privileges on the basis of race. Both direct and indirect violations of the MEAA are proscribed. Because there is an issue of material fact whether Defendants knew of the racial harassment and failed to take prompt and reasonable remedial action, summary judgment on this claim would be improper, and Defendants' motion on the MEAA claim is **DENIED**.

### D.   Intentional Infliction of Emotional Distress

Plaintiffs' next claim is that the Board intentionally inflicted emotional distress on them by allowing a racially hostile environment to continue unabated, despite notice.

Under Michigan law, to support a claim of intentional infliction of emotional distress, a plaintiff must prove the following elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. *Frohriep v. Flanagan*, 278 Mich. App. 665, 683-684, 754 N.W.2d 912, 924-925 (2008). The offending conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Hayley v. Allstate Ins Co.*, 262 Mich App 571, 577; 686 NW2d 273 (2004).

Plaintiffs cite no cases, and the Court did not find any, where liability was imposed for intentional infliction of emotional distress based on a third party's intentional conduct. Plaintiffs say the standard is met by proving deliberate indifference. Defendants say they can only be held liable for their own intentional conduct, and only if they meet the extreme and outrageous standard.

The Court does not reach this question, however, because Plaintiffs failed to demonstrate that they suffered severe emotional distress. Distress is extreme only to the extent that it is "so severe that no reasonable man could be expected to endure it." *Granger v. Klein*, 197 F. Supp. 2d 851 (E.D. Mich. 2002) (citing *Roberts v. Auto Owners Ins. Co.*, 422 Mich. 594, 602, 374 N.W.2d 905 (1985)).

Defendants' motion for summary judgment is **GRANTED** on the Intentional Infliction of Emotional Distress claim.

### E.     42 U.S.C. § 1983 Claims Against Individual Defendants Dahlke, Stout, Daniels, Crosby, Demashkieh, Hering, Jones, Meeker, and Kovar

#### 1.  Qualified Immunity

Plaintiffs' 42 U.S.C. § 1983 claims are against Defendants Dahlke, Stout, Daniels, Crosby, Demashkieh, Hering, Meeker, Kovar, and Jones only. Plaintiffs say the individual Defendants, acting under color of state law, violated their federally protected rights secured by the 14th Amendment. The individual Defendants say they are entitled to qualified immunity because their conduct did not violate any clearly established statutory or constitutional right of Plaintiffs.

When a qualified immunity defense is raised, it is the plaintiff's burden to prove

that the state officials are not entitled to qualified immunity. *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). In evaluating the merits of a qualified immunity defense, the Court must engage in a two-step analysis: (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and if so, (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).

In determining whether a party's conduct violated a clearly established statutory or constitutional right, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Myers*, 422 F.3d at 356 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (internal citation omitted). "Officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002).

When making this evaluation, the Court must first look to decisions of the Supreme Court, then to decisions of the Sixth Circuit and courts within that Circuit, and lastly to decisions of other circuits. *McBride v. Village of Michiana*, 100 F.3d 457, 460 (6th Cir. 1996).

The individually-named Defendants raise two main arguments regarding qualified immunity. First, they say that deficiencies in Plaintiffs' claims demonstrate that Plaintiffs cannot establish any of the three parts of the qualified immunity test. Second, the

individually-named Defendants say there is no evidence that they responded in an objectively unreasonable manner to known harassment.

Defendants argue that Dahlke's efforts to address Port Huron Northern's racial issues were extraordinary, and that Jones and the Board relied on his efforts. They also say Jones consulted with and personally intervened in several ways to assist Dahlke; they don't specify the nature of these interventions. Defendants also say Stout patrolled the halls after the hit list was discovered and assisted with student counseling and encouragement. Thus, Defendants say that Plaintiffs cannot prove that any of the individual Defendants were deliberately indifferent.

However, by Defendants' own admission, only Dahlke made significant efforts to address the racial issues at Port Huron Northern. There is no evidence that the Board members investigated or formulated remedial measures. The Court determined that Plaintiffs presented sufficient evidence to raise a genuine issue of material fact on deliberate indifference and the objective reasonableness of Defendants' conduct.

Additionally, the Court finds that the law was clearly established with respect to a school district's failure to respond to known acts of harassment. The Equal Protection Clause prohibits discrimination based on race. *Shaw v. Reno*, 509 U.S. 630; 113 S. Ct. 2816; 125 L. Ed. 2d 511 (1993). The guarantee of equal protection does not itself prescribe specific duties. It requires Defendants to enforce District policies in cases of peer harassment of black students in the same way that they enforce those policies in cases of peer harassment of white students. See *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985) ("The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to

any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike.").

It has long been established that deliberate indifference to harassment violates students' right to equal protection. See *Gant v. Wallingford Bd. of Educ.*,195 F.3d 134, 140 (2nd Cir. 1999) (citing *Murrell v. School Dist. No. 1*, 186 F.3d 1238, 1249-51 (10th Cir. 1999) (holding that schoolteachers, administrators, and school boards violate equal protection principles through deliberate indifference to sexual harassment of a student by another student).

In light of the evidence Plaintiffs presented, a jury could find that Defendants took no more than the minimal amount of action in response to the complaints of harassment. *Cf. Hagan v. Houston Indep. Sch. Dist.*, 51 F.3d 48, 52-53 (5th Cir. 1995) (finding qualified immunity where the principal interviewed numerous people, documented his investigation, reported the findings to his supervisor, and requested further direction). Thus, the individual Defendants are not entitled to qualified immunity on the ground that Plaintiffs' claims are deficient. Likewise, the individual Defendants are not entitled to qualified immunity based on lack of evidence of objective unreasonableness.

### 2. Sufficiency of the Evidence

Plaintiffs' § 1983 claim is based on a deprivation of rights under the 14th Amendment and an assertion that each individual Defendant was deliberately indifferent to acts of student on student harassment. The individual Defendants say the evidence is insufficient to support these claims.

Section 1983 states in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983.

To succeed on a racial hostility claim under 42 U.S.C. § 1983, a plaintiff must show deliberate indifference on the part of defendants themselves. *Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134 (2nd Cir. 1999).   The evidence shows that Philpot and Chapman notified Jones of the regular use of the "n" word and other racial harassment, and implored him to take appropriate action.  Jones did not think the problem was that bad and advised the Board, "we are in the business of helping children work out their problems.  I am hoping that adults do not turn the situation at Northern into and (sic) adult issue that take (sic) on a life of it (sic) own."  See Def. Motion, Exh. 8; Jones Dep., p. 175-176.

Additionally, Chapman spoke at two school board meetings, at which the individual board members were present, to advise of her son's experience with racial harassment at Port Huron Northern; at the second meeting, she even passed out copies of the racist poster.  Defendants present no evidence that the board members directed any responsive action. Though the individual Defendants presented evidence of steps taken by Dahlke in response to the racial incidents at Port Huron Northern, Plaintiffs presented evidence of continued harassment and that staff members communicated that there was nothing they could do to address the racial slurs unless they heard them. Thus, the question is presented, whether Defendants' efforts to remediate were ineffective, and whether they continued to use ineffective methods to no avail. See

*Vance*, 231 F.3d at 253.

A jury could find that Defendants' actions were deliberately indifferent to Plaintiffs' allegations of harassment, and that they failed to act or acted ineffectively to prevent further harassment toward Plaintiffs. *See, e.g., Flores, 324 F.3d at 1138.* Defendants' Motion for Summary Judgment on the § 1983 claim is **DENIED**.

## V.      CONCLUSION

Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.   Plaintiffs' Title VI, ELCRA, MEAA and § 1983 claims will proceed to trial.

**IT IS ORDERED**.

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  March 30, 2010

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on March 30, 2010.

s/Linda Vertriest
Deputy Clerk